UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | CASE NO. 1:14-CR-00157-001 |
| | § | |
| EMMETTE N. BROWN | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

## I.      INTRODUCTION

Emmette N. Brown respectfully submits this sentencing memorandum in support of his request for a sentence of probation. Specifically, Mr. Brown requests that he be sentenced to 3 years of probation and be ordered to immediately begin satisfying restitution. Such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Such a sentence would also meaningfully prioritize § 3553(a)(7) by empowering Mr. Brown to immediately "provide restitution to [the victim] of the offense."

Mr. Brown punishes himself every day for his momentary lapse of judgment in an otherwise admirable life.  He accepted responsibility and pleaded guilty to one count of Mail Fraud pursuant to 18 U.S.C. § 1341.  He understands that his actions harmed the victim, and he wants nothing more than to make that person whole.  Mr. Brown knows that he cannot fully undo what has already transpired.  Mr. Brown only requests that this Court recognize that (1) this offense was a huge deviation from the honorable life he has lived up to this point; (2) this offense was an uncharacteristic lapse of professional judgment premised entirely on the fact that the

victim had all but already lost the house; (3) he has learned from this mistake and poses no appreciable risk of recidivism, and (4) he wants nothing more than to begin to pay his debt to the victim of his offense.

## II.    OBJECTION TO THE GUIDELINE CALCULATIONS IN THE PRESENTENCE REPORT

Mr. Brown respectfully objects to Presentence Report (PSR) writer Sherry Brandon's inclusion of the two-level enhancement for "sophisticated means" pursuant to United States Sentencing Guidelines (USSG) § 2B1.1(b)(10)(C).   In the Plea Agreement the government and Mr. Brown agreed upon the appropriate Guideline calculations in this case, and it did not include an enhancement for "sophisticated means."   Other than the Probation Office's inclusion of this enhancement, the Guideline calculations in the PSR are correct and consistent with what the parties have agreed.

Applying the two-level enhancement for sophisticated means is inappropriate in this case. The Probation Office believes that this enhancement applies because Probation Office Response

> Pursuant to USSG 2B1.1, comment. (n.9), "sophisticated
> means" is defined as especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense and conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means. To accomplish this tax lien scheme, the defendant used power of attorney forms, where he forged victim's signature, and documents that enabled him to begin acting on behalf of the victim. Additionally, Mr. Brown established 3802 T Street, LLC to give the appearance of a legitimate sale of 3802 T. Street. Mr. Brown's scheme did not involve a single fraudulent act but a series of fraudulent transactions that enable him to execute and conceal the scheme…

*PSR* at 27.

Mr. Brown's offense was not "especially complex or especially intricate," as is suggested by the Probation Office.   *See* PSR at 27.   There is nothing especially complex or intricate about forging signatures on power of attorney forms.   In its *Memorandum in Aid of Sentencing*, the

government agrees that "fraudulent signatures . . . are an easily committed crime." *See Government's Memorandum in Aid of Sentencing* at 9. Additionally, Mr. Brown's use of an entity, 3802 T Street, LLC, to facilitate the real estate sale was consistent with industry practices.[1] The entity was not formed for the specific purpose of giving the appearance of a legitimate sale as the PSR writer suggests. *See PSR* at 27. Undertaking a standard business practice, i.e. forming an entity prior to sale, should not automatically render one's offense as sophisticated.

USSG § 2B1.1(b)(10)(C) states that "[i]f . . . the offense otherwise involved sophisticated means, increase by 2 levels." Application note 9(B) clarifies the definition of "sophisticated means" as "*especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of an offense (emphasis added)." Examples of "sophisticated means" include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *See* USSG Application Note 9(B), §2B1.1.

Most, if not all, fraudulent schemes involve some level of sophistication by the person perpetrating the scheme. This much is apparent from the definition of "fraud" in Black's Law Dictionary: "A knowing misrepresentation of the truth or concealment of a material fact *to induce another* to act to his or her detriment." Black's Law Dictionary (9th ed. 2009) (emphasis added). However, not all fraudulent conduct qualifies for the two-level enhancement for "sophisticated means." In fact, according to statistics maintained by the United States Sentencing Commission, the "sophisticated means" enhancement is infrequently applicable.

---

[1] Counsel can attest that, based upon his personal experience participating in the purchase and sale of approximately forty (40) real estate investment properties that were placed into LLS, placement of a property into a LLC is a standard business practice.

For example, in the most recent statistics available for fiscal year 2013 the enhancement applied to only 11.7% of all fraud cases.[2] Before 2013 the enhancement was even more infrequently applicable, never applying to more than 10% of all fraud schemes.[3] For fiscal years 2002, 2003, and 2005 the enhancement applied to less than 3% of all fraud cases. These statistics tend to demonstrate how sophisticated a fraudulent scheme must be before the enhancement should apply. As serious as the instant offense is, to classify it in the top 10% of most sophisticated frauds perpetrated in 2014 would be both wrong and disingenuous.

In justifying the applicability of the two-level enhancement in this case, the PSR writer states:

> The defendant was able to facilitate and conceal his involvement in this tax lien scheme by involving his father and a close associate as power [sic] attorneys and establishing 3802 T Street, LLC for the sole purpose of purchasing 3802 T Street.

*PSR* ¶ 41.

There is nothing inherently sophisticated about using one's family member or associate to perpetrate a fraud. In fact, the use of family members or close associates indicates a lack of sophistication. Instead of falsifying, stealing, or creating identities like a sophisticated criminal, Mr. Brown employed people closest to him because they were readily available.

Furthermore, Mr. Brown's formation of 3802 T Street, LLC is in no way indicative of "sophisticated means." Forming an entity for each tax lien sale is a common business practice. In this case, the least sophisticated type of business entity was used: a limited liability company.

---

[2] U.S. Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics: Guideline Calculation Based, Fiscal Year 2013* at 11 *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2013/Use_of_Guidelines_and_Specific_Offense_Characteristics_Guideline_Calculation_Based.pdf.
[3] Comparing Guideline Application Frequencies for Fiscal Years 2002 – 2012 *available at* http://www.ussc.gov/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies.

Because tax lien properties are usually not intended to be sold on the retail market as owner-occupied properties, just to investors, most investors title the property as an LLC by using some portion of the address in the entity name.  By doing so initially, it makes the sale easier for the investor-buyer.  The property can be transferred to the buyer as an asset of the entity created (selling the company).  There is no need to retitle the property or go through the hassle and expense associated with changing the deed.  This is why Mr. Brown formed 3802 T Street, LLC.  It was not done for the sinister purpose of giving "the transaction the appearance of a legitimate sale," as is suggested by the *PSR* writer.  *See* PSR at 27.

Given how infrequently this enhancement is used, the case law in this jurisdiction addressing this issue is limited.[4]  In each case the applicability of the enhancement was affirmed.  However, the offense conduct in the instant case is factually distinguishable from prior decisions because it is markedly less sophisticated.  For example, in *United States v. Bisong* the defendant utilized "shell corporations," conduct specifically identified in the Guidelines as an example of "sophisticated means."  645 F.3d 384, 400 (D.C. Cir. 2011); Application Note 9(B), §2B1.1.  Mr. Brown's conduct did not involve a shell corporation for the sole purpose of carrying out the fraudulent transaction.  The practice of using entities to purchase tax lien properties is standard in the industry, and was not motivated by Mr. Brown's desire to conceal or execute the fraudulent transaction.

In *United States v. Gutierrez* the defendant actively changed his business and billing practices to evade detection when his employer, the Inter-American Development Bank, instituted better accounting and auditing technology.  2006 WL 1466914 at *2.  The techniques

---

[4] A Boolean search on Westlaw for "sophisticated means /p enhance!" returns only six (6) decisions, four (4) Circuit Court and two (2) District Court, in the District of Columbia.  They are: (1) *United States v. Hunt*, 25 F.3d 1092 (D.C. Cir. 1994); (2) *United States v. McCants*, 554 F.3d 155 (D.C. Cir. 2009); (3) *United States v. Gutierrez*, 2006 WL 1466914 (D.D.C. 2006); (4) *United States v. McCants*, 434 F.3d 557 (D.C. Cir. 2006); (5) *United States v. Bisong*, 645 F.3d 384 (D.C. Cir.  2011); (6) *United States v. McCants*, 2006 WL 3086883 (D.D.C. 2006).

employed by the defendant enabled him to evade detection for approximately 10 years. *Id*. The defendant in that case also created fictitious entities, conduct specifically identified as "sophisticated means" by the Guidelines. *Id*. This is unlike Mr. Brown's case. Mr. Brown did not employ any sophisticated measures to avoid technological advancements in accounting or auditing. Nor did he create fictitious entities for the purpose of executing or concealing the fraudulent transaction. In this case, Mr. Brown employed practices that were standard for the business in which he was engaged, albeit one time with a fraudulent purpose

Upon consideration of foregoing Mr. Brown respectfully asserts that the PSR writer's inclusion of the enhancement was inappropriate. The Court should therefore conclude that the applicable Guidelines Offense Level is 14, as was understood by the parties in the Plea Agreement they signed.

## III.     THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *Id*. at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id*. at 49-50, and explain how the facts relate to the purposes of sentencing. *Id*. at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. at 101; *Pepper*, 131 S. Ct. at 1242-43.

In order to to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are

now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 131 S. Ct. 1229, 1240 (2011) (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

### A. Widespread Disagreement with the Fraud Guideline is Further Evidence that it is Unsound.

In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases; 23.7% were government-sponsored, 23.8% were non-government sponsored. *See* U.S. Sent'g Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl.27. "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance," *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white-collar offenses. *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. at 22-23 (1988). The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. *See* USSG § 2F1.1 (1987).

The Commission explained "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004) [hereinafter Fifteen Year Report] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement.").

The Commission's deterrence rationale, however, was not based on empirical evidence. The empirical research regarding white-collar offenders shows no difference between the

deterrent effect of probation and that of imprisonment. *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995).

Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. The effect of those increases on this case was to add one level for loss in 1989, to add two more levels for loss in 2001, to increase the base offense level by two levels in 2001, and to increase the base offense level again by one level in 2003. As a result, Mr. Brown's advisory guideline range is over twice the range under the original 1987 guideline:

**1987 Guidelines**

USSG §2B1.1(a) – Base Offense Level……………………………………..…4

USSG §2B1.1(b)(1)(I) – Loss between $100,000 and $200,000…………..+8

USSG §3E1.1 – Acceptance of Responsibility……………………………..…-2

*Total Offense Level 10* (Range of 6 to 12 months imprisonment)

**2013 Guidelines**

USSG §2B1.1(a)(1)– Base Offense Level…………………………………..…7

USSG §2B1.1(b)(1)(F) – Loss between $120,000 and $200,000…………...+10

USSG §3E1.1(a), (b) – Acceptance of Responsibility………………………-3

*Total Offense Level 14* (Range of 15 to 21 months imprisonment)[5]

So why then was a guideline range of 6 to 12 months a reasonable sentence in 1987; but in 2013 a sentence of 15 to 21 months is a reasonable sentence for the same conduct? Or,

---

[5] The increase in the length of the sentence is this drastic even without including the two-level enhancement for "sophisticated means" pursuant to USSG §2B1.1(b)(10)(C), as is suggested by the PSR writer. If the Court were to apply that enhancement, the applicable Guideline Range would be over three times as long.

perhaps even more important to the relief requested in this case, the Guidelines in 1987 would have permitted the Court to sentence Mr. Brown to a term of probation (with conditions) while the 2013 Guidelines prohibit a sentence of probation. *Compare* §5B1.1(a)(2), USSG (1987) *with* Part A, Ch. 5, USSG (2013) (Zone D sentence on sentencing table). Why was probation a reasonable sentence for someone similarly situated to Mr. Brown in 1987 but not in 2013?

In 2013 Justice Thomas discussed the Guidelines in the context of Ex-Post Facto issues in *Peugh v. United States*:

> [T]he Guidelines do not constrain the discretion of district courts and, thus, have no legal effect on a defendant's sentence. Second, to the extent that the amended Guidelines create a risk that a defendant might receive a harsher punishment that risk results from the Guidelines' persuasive force, not any legal effect....
>
> Petitioner next argues that the Guidelines limit district court discretion because sentences falling outside the Guidelines are more likely to be reversed for substantive unreasonableness. Brief for Petitioner 25. I doubt, however, that reversal is a likely outcome when a district judge can justify his sentence based on agreement with either of two Guidelines — the old or the new. If a district court calculated the sentencing range under the new Guidelines but sentenced the defendant to a below-Guidelines sentence that fell within the range provided by the old Guidelines, it would be difficult to label such a sentence "substantively unreasonable." To do so would cast doubt on every within-Guidelines sentence issued under the old Guidelines.

These passages from Justice Thomas enable sentencing courts to feel confident that a sentence within the range suggested by the 1987 Guidelines should nearly always be deemed reasonable. A reasonable sentence would therefore include a sentence of probation for Mr. Brown in the instant case if this Court were to sentence him pursuant to the 1987 Guidelines.

**B. The Fraud Guidelines are not an Accurate Measure of the Circumstances of the Offense.**

United States District Court judges often do not find credence in the fraud guidelines. According to the most recent sentencing statistics released by the United States Sentencing Commission, the average sentence imposed in fraud cases is 50.3% lower than the guideline minimum.[6]

The Sentencing Commission recognizes the need to revise the fraud guidelines and one of their priorities for the upcoming amendment cycle includes: "As it did last year, the Commission noted in its priorities a focus on fulfilling its statutory mandate to work to reduce overcapacity in federal prisons."[7]

The Sentencing Commission also set out its intention to consider potential changes to the Guidelines resulting from its multi-year review of federal sentences for economic crimes. It identified sentences for "fraud on the markets" cases, with large loss amounts diffused over large numbers of victims who often have small losses, among the specific issues it will consider.[8]

"For the past several years, we have been reviewing data and listening to key stakeholders to try to determine whether changes are needed in the way fraud offenses are sentenced in the federal system," Commissioner Saris said. "We look forward to hearing more this year from experts on these issues and deciding whether there are ways the economic crime guidelines could work better."[9]

---

[6] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2014-3rd-Quarterly-Report.pdf
[7] http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140814_Press_Release_Revised.pdf
[8] http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140814_Press_Release_Revised.pdf
[9] http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20140814_Press_Release_Revised.pdf

This is relevant here because Mr. Brown's offense was not a fraud designed to specifically target and swindle the victim.  It was a fraud on the market, and specifically on the integrity of an already suspect but legal practice: tax lien sales, where homeowners lose their homes for falling behind on their taxes.

By the time Mr. Brown committed the offense, the victim had all but already lost his home because of the victim's approximately five (5) years of tax arrearages.  Mr. Brown is not responsible for the victim's own decision to not pay his taxes.  Unfortunately, as a result of his non-payment of taxes, the victim would today be in the same position, without 3802 T Street and the personal property within it.  Given the relevant timeline 3802 T Street would have been foreclosed upon and sold while the victim was still in Russia and totally unreachable for five (5) years.

The Superior Court judge that oversaw the tax lien sale process for 3802 T Street had already approved "service by publication" on April 9, 2008.  *See* PSR at ¶24.  This is the lowest threshold for notice prior to a tax foreclosure, and it occurred before Mr. Brown commenced his offense conduct.  *See* PSR at ¶¶ 25-32.  After only three weeks of successive publication the property would have been foreclosed upon. *See* D.C. Code § 47-1375.  The victim, who was unreachable for five (5) years, did not return until March of 2009, nearly one year after the service by publication order.  *See* PSR at ¶ 32.   As such, even if Mr. Brown had not come into contact with the property, 3802 T Street and the personal property within it would have been sold through foreclosure well before the victim ever returned from Russia.

To attribute the entirety of the victim's harm to Mr. Brown or to say that Mr. Brown specifically targeted the victim would be a distortion of the uncontested facts.  The fraud guidelines in this case miss the mark in attributing proper culpability to Mr. Brown.

**IV.     18 U.S.C. § 3553(A) FACTORS**

A variance is required to ensure the § 3553(a) factors are properly considered so that a sentence sufficient but not greater than necessary is imposed in this case. Of particular import are the following sentencing factors:

### A. Mr. Brown's Military Record, Positive Social History, and Good Character Demonstrate that the Instant Offense was an Aberration.

By all accounts, Mr. Brown is a loving father and partner. He is a contributing member of the community, selfless, and attempts to hold himself out as a model citizen. He has raised three sons into successful, educated, and contributing members of society. This was no easy feat, especially when one considers the statistics measuring an African American male's experience in the United States. Mr. Brown's own son, Evan N. Brown, points out the following about his father's determination to have his sons beat the odds:

> [S]tatistical evidence suggests that many fathers, and some mothers, are not simply disinterested with the needs of their children, but are not even concerned with their existence. I was blessed to have one that was there for me every step of the way, as well as for other people's children.

*Letter* submitted by Evan N. Brown.

Mr. Brown's first marriage ended in divorce. His ex-wife had no interest in raising their three young boys. Mr. Brown rose to the occasion and raised three young men on his own. As his long-time domestic partner Michelle Curtis mentions in her letter, Mr. Brown believes that, "Children don't ask to come here. Once they're here, you owe them to be the best parent you can be." Mr. Brown's tireless efforts to be the best parent he can be are demonstrative of his good character. As recounted by his partner, Ms. Curtis:

> He is completely dedicated to his sons and [has] raised them to understand that their word is their bond and possessing integrity and assuming personal responsibility are virtues of a good man and obligations of every person.

*Letter* submitted by Michelle R. Curtis.

Mr. Brown's good character and positive background are reinforced by his military career. Perhaps the most selfless and honorable thing a person can do for their country is to serve in the military. Mr. Brown enlisted in the U.S. Army on July 23, 1980 and served for four years. He was honorably discharged and earned the rank of Sergeant E5 in just three years of service. His military service stationed him in Kentucky, Germany, and Virginia. During his service he earned commendations and achievement medals, good conduct medals, and overseas and non-commissioned officer professional development ribbons. Mr. Brown's dedication to his country should not be overlooked for purposes of sentencing, as it demonstrates his devotion to country and his ability to put others before himself.

Mr. Brown values education as a virtue. He instilled the same into his sons, as they are all either graduated from institutions of higher learning or currently enrolled in such institutions. Mr. Brown's eldest son, Evan N. Brown, works for the National Housing Trust, a nonprofit that "protects and improves existing affordable rental homes so that low income individuals and families can live in quality neighborhoods with access to opportunities."[10] Mr. Brown's good character is reflected in his eldest son's choice of work. Mr. Brown's two other sons are currently enrolled in college.

Mr. Brown is a college graduate, holding a Bachelor of Science degree from Northeastern University. He was recently accepted into Cornell's Executive Masters Business Administration Program but he had to defer his admission due to the instant case, and will of course lose his place in the program if he is incarcerated. However, this case hasn't completely dissuaded and distracted Mr. Brown from pursuing additional educational opportunities. He enrolled in an online program at Cornell University and received certifications in Hotel Revenue Management

---

[10] Mission Statement, National Housing Trust *available at* http://www.nhtinc.org/about.php.

and Hotel Real Estate Asset Management on October 14, 2014.  This most recent educational attainment was made with an eye to the future in light of the instant offense.  Mr. Brown wants to be ready to move forward and pay restitution to the victim once this case is behind him.

Mr. Brown's dedication to helping others and improving the community is undeniable. The letters submitted in support of Mr. Brown clearly paint the picture of a selfless man who went out of his way to help others and to be a good role model.  James Knox points out that all but one of the 16 children Mr. Brown coached in basketball are now attending college or prep school.  KaLena-Denise Peacock describes how Mr. Brown mentored her and gave her the opportunity (and mental fortitude) to pursue her dreams.

Rebecca Hines describes how Mr. Brown was simply a patron at the café she worked at until he heard that she had a serious automobile accident that left her unable to work.  Mr. Brown spearheaded and organized an impromptu fundraiser that allowed Ms. Hines to support her family while her case worked through the court and insurance systems.  She describes Mr. Brown as a "godsend."

There are many more letters confirming Mr. Brown's positive social history and good character.  *See* Attachment 1 - Character Letters.  Mr. Brown has led a commendable life for 52 years.   The instant offense it totally out of character for someone who has raised such a beautiful family, honorably served the military, selflessly helped others in times of need, and values education.  Imprisoning Mr. Brown would be greater than what is necessary given his "history and characteristics." § 3553(a)(1).

Also attached is a letter written by Mr. Brown in which he accepts responsibility for his crime and describes the personal shame and embarrassment he feels for committing it.  *See* Attachment 2-Mr. Brown Letter.

**B. Mr. Brown Should be Required to Immediately Satisfy an Aggressive Order of Restitution in a Non-Custodial Setting.**

There is one victim in this case, and he alone stands to benefit from the imposition of a sentence that prioritizes restitution. 18 U.S.C. § 3553(a)(7). Consistent with his good character and fear of God, Mr. Brown wants nothing more than to do right by the person he wronged, including doing everything in his power to make the victim whole, both emotionally and financially. As such, Mr. Brown is motivated to get to work and aggressively satisfy an order of restitution to immediately begin improving the victim's life. Imprisoning Mr. Brown will only serve to delay the justice the victim actually needs, to be made whole.

Now that the Guidelines are only advisory, this Court can prioritize the § 3553(a) factors that best take into account the particular facts and circumstances of this case. Prioritizing § 3553(a)(7) in a non-violent matter involving only one victim would be both reasonable and sufficient.

Prioritizing restitution over the other sentencing factors is consistent with the circumstances of this case. Mr. Brown did not specifically prey on or target the victim in this case. In the course of Mr. Brown's business be became aware of a property that had fallen into significant arrears in its federal and local taxes. In fact, the victim's property and personal taxes had gone unpaid for approximately five (5) years. The victim did not make an appearance in any of the court dates related to the tax sale. Mr. Brown also endeavored to locate the victim, but failed in his attempts because unbeknownst to him, the victim was living in Russia at the time. Assuming that the victim had probably died or abandoned the property, Mr. Brown undertook the now regrettable decision to falsify documents to facilitate the sale. Mr. Brown did not intend to cause harm, and therefore should not be imprisoned for his crime. Sentencing him to probation will enable him to quickly make significant progress in making the victim whole.

***C. The Need to Avoid Unwarranted Sentencing Disparities Militates in Favor of a Significant Downward Variance.***

The Court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). As is made clear in the Statement of Offense, Mr. Brown did not act alone. However, he stands before this Court alone, with no co-defendants or related criminal defendants. This is the case even though the Statement of Offense makes clear that Mr. Brown "was not the organizer, leader, manager, or supervisor" of the other persons who were involved in the offense. *See* Statement of Offense at 5.

A person just as culpable as Mr. Brown is attorney Carolyn Mardis.[11] On or about April 30, 2008 Ms. Mardis made false representations to a Superior Court Magistrate Judge that she had been in contact with the victim. *See* PSR at 7. In reality, no contact was ever made. *See* PSR at 7. She further represented to the Court that the victim had made a redemption request and that payoff information for the applicable tax lien on 3802 T Street had been provided to the victim. *See* PSR at 7. Again, Ms. Mardis knew that she had not provided this information to the victim. *Id*.

Without Ms. Mardis' false representations to the Court, the fraudulent transaction could not have occurred because the property would have gone to tax foreclosure. Instead, Ms. Mardis circumvented the proper administration of the notice statute and willfully misled the judiciary to make the fraudulent transaction possible. However, as of the filing of this Memorandum, Ms. Mardis has escaped criminal prosecution.

Mr. Brown is already suffering from the collateral consequences of this criminal case. He had to defer his acceptance to the Cornell University Executive Masters Business

---

[11] Ms. Mardis is identified as "Person C" in the Statement of Offense.

Administration Program.  Mr. Brown will also likely have to change his career, something that is difficult to accomplish in this sluggish economy, and made especially more difficult for a person who is 52 years old.  He is thoroughly embarrassed by his actions and has lost credibility in the community, credibility he had spent his whole life building.

Yet, Ms. Mardis does not have to suffer even the consequences of being named in a criminal case, let alone risk being incarcerated.  In fact, Ms. Mardis received over $62,000 of the proceeds from the sale of 3802 T Street. This Court can help balance justice and avoid unwarranted disparities by imposing a sentence of probation against Mr. Brown.  Such a sentence would be sufficient but not greater than necessary to achieve the purpose of § 3553(a)(6).

### D. Mr. Brown Poses No Risk of Recidivism.

Of all of the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Brown does not fit the archetype of a person who will commit new criminal offenses or recidivate.  And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that actually take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's reinvigorated role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While surprising at first glance, this finding should be expected as the Guidelines' offense level is not intended or designed to predict recidivism." *U.S Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004)

(hereinafter *Measuring Recidivism*).   Thus, the guidelines are at odds with 18 U.S.C. §

3553(a)(2)(C), and *Booker* has freed the judiciary to remedy this inconsistency.

For example, the Sentencing Commission indicates that defendants "over the age of forty

. . . exhibit markedly lower rates of recidivism in comparison to younger defendants."   *See*

*Measuring Recidivism* at 12, 28.   Mr. Brown is 52 years old, and there is nothing in the record to

make this Court reasonably believe that the Commission's conclusion that "[r]ecidivism rates

decline relatively consistently as age increases" would not apply to Mr. Brown.   *Id*.   Amongst

first time offenders like Mr. Brown who are over the age 50, only 6.2% recidivate.   *Id*. at 28.

The Sentencing Commission has also found that first offenders like Mr. Brown are rarely

reconvicted of a crime.   In fact, only 3.5% of first offenders with zero criminal history points are

ever reconvicted.   *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May

OF 2004) (hereinafter *First Offender*).   And only 11.7% of all first offenders ever find themselves

back in the criminal justice system (defined as reconviction, re-arrest, or revocation).   *First*

*Offender* at Exhibit 6.   Mr. Brown has never before been involved in the criminal justice

system.[12]   This is his very first encounter, and the experience has already taught him valuable life

lessons to ensure he does not repeat the mistakes he made leading up to his arrest.

It is unfortunate that the guidelines' offense levels do not take into consideration such

data.   This data exists, yet is not utilized to inform the Commission's rulemaking.   However,

without even considering the circumstances of the offense, it is apparent that Mr. Brown is not

one who is statistically likely to recidivate.   And when one considers such statistics in light of

Mr. Brown's demonstrated record of charitable acts, involvement in the community and church,

---

[12] The PSR lists one case in Maryland in which a *nolle prosequi* was entered.   *See* PSR at 54.   The case however, did
not involve "criminal activity, and subsequently, the case was expunged."   *See* PSR at 55.

and family values, it is safe to assume that he will never again be arrested, let alone charged with an offense.  Aberrations only occur once, and that is certainly true for Mr. Brown.

### E. Mr. Brown's Publicized Demise Serves as Adequate Deterrence.

Section 3553(a)(2)(B) requires the judge to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  While white collar offenders like Mr. Brown are presumably the most rational of potential offenders, no difference in levels of deterrence was found between even those who served terms of probation and imprisonment.  David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995).

Not only do people like Mr. Brown not expect to be caught, they simply do not consider sentencing consequences in the manner one might expect of rational decision makers.  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).  Furthermore, "[t]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). Therefore it may seem that *certainty* of punishment is a more effective deterrent than *severity* of punishment.

Arguably, the g

overnment already substantially achieved the maximal deterrent effect of Mr. Brown's offenses simply by charging him and convicting him.  As a result, Mr. Brown's name and the substance of his offense appears on numerous online blogs and websites, further spreading news that tax lien-related indiscretions will ruin your life and reputation.  Mr. Brown got caught, and

his life is ruined.  Everyone who interacts with Mr. Brown today knows this to be true.  Anyone foolish enough to pursue a tax lien sale that is too good to be true has already been warned.  Sending Mr. Brown away to prison now does not appreciably contribute to the deterrent effect that has already been achieved.  It is therefore greater than necessary to accomplish this purpose of sentencing.

Mr. Brown respectfully requests a sentence of three years of probation with the condition of restitution.  Such a sentence is sufficient, but not greater than necessary to achieve the legitimate purposes of sentencing in § 3553(a).  However, if this Court is inclined to imprison Mr. Brown he requests that he be designated to the minimum security camp at FCI Schuylkill as it is near both his father in Pennsylvania and his children in the DC metro area.

Date: October 28, 2014

Respectfully submitted,

_____/s/_____

David Benowitz
Bar # 451557
*Counsel for Emmette Brown*
Price Benowitz LLP
409 7th Street, NW
Suite 200
Washington, DC 20004
Office: (202) 417-6000
Mobile: (202) 271-5249
Fax: (202) 664-1331

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Defendant's Memorandum in Aid Sentencing was filed on October 29, 2014 via ECF.


_____/s/_____
David Benowitz